378 So.2d 806 (1979)
COLONIAL LIFE & ACCIDENT INSURANCE COMPANY, Appellant,
v.
Dorothy A. COOPER, Appellee.
No. 79-328.
District Court of Appeal of Florida, Third District.
December 11, 1979.
*807 Dixon, Dixon, Hurst, Nicklaus & Webb, Miami, for appellant.
Greene & Cooper and Marc Cooper, Post & Gordon, Miami, for appellee.
Before HENDRY and SCHWARTZ, JJ., and CHAPPELL, BILL G., Associate Judge.
SCHWARTZ, Judge.
Colonial Life & Accident Insurance Company, the defendant in the lower court, appeals from a final summary judgment holding it liable to pay under an accident policy which insured the life of Clarence Cooper. We reverse because of the record showing that Cooper died as a result, not of an "accident," but of injuries which he intentionally inflicted upon himself.
The circumstances involved in this case may be conservatively described as bizarre. On December 13, 1975, Cooper, along with his brother Joseph, was engaged in the repair of the roof of a one-story commercial building in Miami. According to portions of Joseph Cooper's deposition, which represented the only evidence on the issue available when the summary judgment was entered below, Clarence deliberately jumped from the roof with the specific intention of injuring himself and thus providing the basis for a compensation claim or lawsuit to recover damages on his behalf. Joseph Cooper stated:
Q Did you see your brother go over this roof?
A Yes. I saw him went over.
* * * * * *
Q I want to know how he got off the side.
A Jump off. That is how he got off.
Q He jumped?
A That is right. Caught the tree limb and he swing and his foot hit the other building and the limb broke and he caught the fence and he hit on his head.
Then I went down the ladder. My nephew was down there working and he said, `Well, you done got the sue.' That is what he call it.
Q Sue like a lawsuit?
A That is right.
* * * * * *
Q Are you telling me, Mr. Cooper, is it your testimony, that your brother jumped off of this roof?...
A That is what I saying, yes.
Q Prior to the time your brother went off the side of this building did he give you any indication 
A No. He give me an indication before that happened.
Q Let me finish my question. You have to let me ask the question before you give me an answer.
Before he went off the side of the building, did he give you any indication he was going to do that?
A Before he went off?
Q Yes.
A Yes. He was talking about it. Talk about he could get a chance, taking the job for nothing. `You need to get something for the job.'
We was talking about it the day before and the day after the day when he went off.
* * * * * *
Q When you and Clarence were discussing, as you have told me, him injuring himself intentionally, was there anyone else around? You were discussing it the day before and the day of the accident, you said.
A Well, Ralph, he was around and I think Adam come up there. I'm not sure *808 Adam come up there. He come over that morning. He was talking; come over that morning. What he was saying, this is a good time to get something going.
Q When did he say that?
A He said that the first day we work on the roof. He said, `You be working for these white people. Don't get nothing going, you never have nothing,' something in that neighborhood.
Q He said this is a good time to get something going?
A Yes.
Q Did he explain what he meant by `get something going'?
A Yes. What we explain it, what we take it for, okay, you working on the job and you want to get the suing or something. You get hurt or something and then you sue. That is what he go for. [e.s.]
As it turned out, Cooper accomplished his purpose all too well. As a result of the jump, he sustained, among other things, a serious injury to his right leg which resulted in his confinement in Jackson Memorial Hospital from December 14 to December 24, 1975, when he was discharged. Four days later, however, he was readmitted to JMH where the next day, December 29, he died. An autopsy revealed that the cause of death was an embolus which had emanated from Cooper's injured right leg and had lodged in his pulmonary artery. Thus, he had died as a direct result of his intentional jump from the roof.
At the time of his death, Cooper was insured by a "Major Compensation Accident Policy" issued by Colonial Life. Bold letters on its first page stated that
"This Policy provides indemnity for loss of life, limb, sight or time caused by bodily injuries effected by accident as herein limited and provided." [e.s.]
Also on the first page, the general insuring agreement was similarly stated, although in more detail and in smaller print, as follows:
"THE COMPANY ... insures the person named ... against loss resulting directly, independently and exclusively of all other causes from bodily injuries effected solely by accident ..." [e.s.]
When the beneficiary, Cooper's wife Dorothy, sued the insurer for $10,000 in death benefits under the policy, Colonial Life denied liability primarily[1] on the ground that her husband had not died by "accident" as the policy required.
In support of her motion for summary judgment,[2] the plaintiff argued below  as she does here  that while there was obviously evidence that Cooper intended to injure himself, there was none that he wished to commit suicide. It was therefore contended, based primarily upon Gulf Life Ins. Co. v. Nash, 97 So.2d 4 (Fla. 1957) and its progeny, that the thus-unintended death, the loss for which insurance was provided, was in fact an "accident." In granting the motion, the trial court obviously accepted that argument. For two separate reasons, we do not.
(1) The claim that it is essentially irrelevant that the injuries which resulted in the death were intentionally caused flies directly in the face of the controlling language of the insurance contract. The policy specifically does not insure against a death "caused or effected by accident," but rather against "loss of life ... caused by bodily injuries effected by accident." Thus a determination  well justified by the evidence  that the "bodily injuries" which caused Cooper's death were themselves caused intentionally would preclude liability. This is so because it is clear that an intentional injury is not an "accident" within the meaning of this policy term. E.g., Leatherby Ins. Co. v. Willoughby, 315 So.2d 553 (Fla.2d DCA 1975); Grange Mutual Casualty Co. v. Thomas, 301 So.2d 158 (Fla.2d DCA 1974). The clear and unambiguous provisions of the policy alone therefore render untenable the appellee's position in support of the summary judgment. *809 See Goldsby v. Gulf Life Ins. Co., 117 Fla. 889, 158 So. 502 (1935); 18 Fla.Jur. Insurance § 401 (1971).
(2) Even under broader policy language, the finding that, as a matter of law, the death was "accidental" may not be sustained. In two separate cases this court has held that when an insured intends to cause injury, the result of his action does not constitute an accident even if the damage is more severe than he wished or anticipated. In Hartford Fire Ins. Co. v. Spreen, 343 So.2d 649 (Fla.3d DCA 1977), we rejected a claim that an "accident" had occurred when unexpectedly serious injuries were caused by a deliberate assault and battery. Decisively distinguishing each of the decisions relied upon by the appellee here, the court stated at 343 So.2d 650-652:
The Florida courts in a line of cases have consistently held that insurance policies covering liability for an `accident' apply to any bodily injury or property damage inflicted by the insured on a third party where the insured does not intend to cause any harm to the third party; this result obtains even though damages are caused by the insured's intentional acts and were reasonably foreseeable by the insured. Insurance coverage has accordingly been found under such policies where an insured unintentionally shoots himself while playing "Russian Roulette", Gulf Life Insurance Co. v. Nash, 97 So.2d 4 (Fla. 1957); or unintentionally shoots himself while attempting to disarm a person in a fight in which the insured is the aggressor, Harvey v. St. Paul Western Insurance Cos., 166 So.2d 822 (Fla.3d D.C.A. 1964); or unintentionally shoots a bystander during a family quarrel, Grange Mutual Casualty Co. v. Thomas, 301 So.2d 158 (Fla.2d D.C.A. 1974); or unintentionally hits a person in a crowd of people with a car while slowly driving into the edge of the crowd intending to disperse them, Phoenix Ins. Co. v. Helton, 298 So.2d 177 (Fla.1st D.C.A. 1974), or unintentionally injures a person in a car while intentionally pushing the car which was blocking a driveway, Cloud v. Shelby Mutual Insurance Co., 248 So.2d 217 (Fla.3d D.C.A. 1971). Running through all of these cases is an act of negligence by the insured, sometimes gross or even culpable negligence. But never has coverage been found under such policies where the insured's act was deliberately designed to cause harm to the injured party.

* * * * * *
The appellees argue that while Spreen intended to hit King he did so on the spur of the moment, did not foresee the extent of King's injuries, and therefore did not intend them. The argument is unpersuasive. It is a subtle method of introducing the tort rule of reasonable foreseeability into insurance contract cases through the back door. Such a notion has been repeatedly rejected by the Florida courts... . The fact that Spreen did not foresee the extent of King's injuries when he swung at King can no more provide coverage under the Hartford policy than can coverage be denied by the fact that Spreen should have foreseen such injury. Foreseeability is irrelevant to the coverage issue. The sole issue is whether Spreen intended to inflict any harm on King. This he clearly intended to do and the fact that he did not foresee or intend the extent of the harm inflicted does not convert the admitted assault and battery into an accident. Clark v. Allstate Insurance Co., 22 Ariz. App. 601, 529 P.2d 1195 (1975); Terito v. McAndrew, 246 So.2d 235 (La. App. 1971). [e.s.]
There can be no question that this doctrine applies when, as in this case, there is evidence that the act which was intended to cause injury is directed against oneself. In Southern Life & Health Ins. Co. v. Medley, 161 So.2d 19 (Fla.3d DCA 1964), the deceased died as a result of a plunge from a moving automobile. The question of whether she fell or deliberately jumped was in hot dispute. At 161 So.2d 24-25, citing Gulf Life Ins. Co. v. Nash, supra, we said:
It was further error on the part of the trial court to fail to instruct that the plaintiff may have failed in her burden of *810 proving accidental death if death resulted from an intentional act, not intended or expected to be attended with injurious results to the actor. In other words, if the jury finds that the deceased did not intend to commit suicide, but intentionally jumped from the car they must find for the defendant. Under those circumstances the death would not be accidental.[3] [e.s.]
We reject the appellee's contention that we should repudiate this holding which she rather presumptuously contends is based on a misinterpretation of what constituted the prevailing opinion in Nash.[4] We think, to the contrary, that this conclusion is fully consistent with that decision and particularly with the adoption, at 97 So.2d 9, of the following portion of Justice Cardozo's dissent in Landress v. Phoenix Mutual Life Ins. Co., 291 U.S. 491, 501, 54 S.Ct. 461, 464, 78 L.Ed. 934 (1934):
"If there was no accident in the means, there was none in the result, for the two were inseparable * * * There was an accident throughout, or there was no accident at all."
As in Medley and Spreen, the facts as the jury could find them in the present case would not permit the separation of Cooper's intentional act from the result of that act so as to render his death an accident.
Because there is evidence that Cooper deliberately caused the injuries from which he died,[5] we reverse the summary judgment below and remand for further proceedings consistent with the views expressed herein.[6]
Reversed and remanded.
NOTES
[1] The other grounds of defense are treated at note 6, infra.
[2] The insurer did not move for summary judgment in its behalf.
[3] In Zuliskey v. Prudential Life Ins. Co. of America, 159 Pa.Super. 363, 48 A.2d 141, 142 (1946), on facts identical to those in Medley, the court cogently and correctly observed

[I]f this were all there could be no recovery, because the insured purposely jumped from the moving vehicle. That she did not intend to die may be true, but that the injuries were greater than she had anticipated would not constitute an accident. "If, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, [it] has resulted through accidental means"... . The only unexpected thing was the severity of her injuries.
[4] The majority opinion of Justice Drew is mistakenly labeled at 97 So.2d 8 as one "dissenting in part."
[5] Since the issue is not before us on this appeal in which the insurer seeks only the reversal of the summary judgment for the plaintiff below, see n. 1, supra, we do not address the legal effect of a factual determination that in jumping from the roof, Cooper did not intend to injure himself, but merely wished to lay the groundwork for an entirely fraudulent claim that he had.
[6] The insurer claims the applicability of the policy exclusions from coverage of losses caused by "suicide or any attempt thereat ..." or "caused or contributed by disease ... or medical treatment ... therefor." We find, however, that it was established without genuine issue that neither of these exclusions applied.

We likewise do not agree with the appellant's contention that Mrs. Cooper may not recover, in the absence of a specific exclusion to that effect, simply because the death resulted from a fraudulent act of the insured. See Valley Forge Life Ins. Co. v. Lawrence, 201 So.2d 449 (Fla. 1967); Harvey v. St. Paul Western Ins. Co., 166 So.2d 822 (Fla.3d DCA 1964); cf. Everglades Marina, Inc. v. American Eastern Development Corp., 374 So.2d 517 (Fla. 1979).